Callan Court Company v. Commissioner.
Callan Court Co. v. Commissioner
Docket No. 4200-63.
United States Tax Court
T.C. Memo 1965-261; 1965 Tax Ct. Memo LEXIS 71; 24 T.C.M. (CCH) 1419; T.C.M. (RIA) 65261; September 30, 1965
M. E. Kilpatrick, 1045 Hurt Bldg., Atlanta, Ga., for the petitioner. J. Larry Broyles, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax, including for the years 1952 and 1953 excess profits tax, in the following amounts: Year
Amount
1952
$537,724.50
1953
$537,724.50
1954
$398,454.20
The primary determination by respondent was with respect to the year 1954 and the deficiencies for 1952 and 1953 were alternative determinations in the event respondent's determination for 1954 was not sustained. The issue for decision is whether petitioner realized taxable income during the year 1954 and, if not, during either of the years 1952 or 1953 because of the running of the statute of limitations of the State *72 of Georgia on the collection of a note under seal executed by petitioner on October 3, 1952. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, a Georgia corporation with its principal office in Atlanta, Georgia, filed Federal income tax returns for the calendar years 1952, 1953 and 1954 with the district director of internal revenue at Atlanta, Georgia. Petitioner was incorporated on April 19, 1921. Its entire capital stock was subscribed by William Candler, Sr. (hereinafter referred to as William) who transferred to petitioner several parcels of real estate, shares of stock in the Coca Cola Company and his note. In exchange for these properties, 75 percent of petitioner's stock was issued to William, 20 percent to William's wife and 2 1/2 percent to each of his two children. The shares of stock issued to William's wife and children were gifts from him. This ownership of petitioner's stock continued until April 1, 1933, when it was changed to one-sixth of the stock being owned by William one-half by his wife and one-sixth by each of William's two children. This ownership continued until William's death on October 2, 1935 when the ownership *73 became one-half owned by William's wife and one-fourth by each of William's children. This ownership of petitioner's stock has continued and was the ownership at the time of the trial of this case. One of the parcels of real estate transferred by William to petitioner upon petitioner's incorporation encompassed an entire city block in Atlanta, Georgia, bounded by West Peachtree Street, Sixth Street, Fifth Street and Cypress Street. Petitioner commenced construction of an apartment building on this real estate and late in 1922 commenced construction of a commercial hotel thereon. On February 15, 1923, while this construction was still in process, William formed another corporation, Atlanta Biltmore Hotel Company (hereinafter called Biltmore) and petitioner transferred to Biltmore the parcel of real estate encompassing the city block in Atlanta, Georgia, as heretofore described, receiving in exchange therefor the entire stock, preferred and common, issued by Biltmore. Biltmore proceeded with completion of the construction of the hotel and apartment building and the furnishing of the hotel. Funds required for these purposes were obtained through the issue and sale by Biltmore of its *74 bonds to the public in the aggregate amount of $3,000,000 and some amounts supplied to Biltmore directly by William and by petitioner. The bond issue was secured by a first mortgage running to the Citizens & Southern National Bank, as Trustee, on the real estate, improvements thereon, and furnishings therein. William in financing Biltmore directly and through petitioner in its acquisition of the real estate and construction and equipping of the hotel and apartment building thereon invested a substantial part of his property which had come to him from his father or his father's estate. The hotel constructed by Biltmore was the Atlanta Biltmore hotel. From the commencement of operations continuously throughout the year 1934 and for a number of years thereafter Biltmore sustained losses which were reported on its Federal income tax returns. The total accumulated capital deficit reported on its return as of December 31, 1933 was $2,150,311.88 and as of December 31, 1934 was $2,253,018.89. The deficit as reported by Biltmore was increased by respondent on audit of Biltmore's returns by an increase in the depreciation rate of the hotel and apartment building from 1 percent claimed in *75 the return to 2 percent. Because of its operating losses, Biltmore was unable to meet its obligations such as interest and principal amortization under its outstanding bond issue, ad valorem taxes and insurance premiums. To enable petitioner to meet some of Biltmore's obligations and save its property from foreclosure, William during the period 1924 through 1934 invested substantially all of the remaining assets which he owned in Biltmore and also caused petitioner to borrow substantial sums on notes which he endorsed. Part of the money petitioner borrowed was from the First National Bank of Atlanta and its predecessor on notes endorsed by William and secured by the following stocks which William transferred to petitioner and petitioner pledged to the bank: 3,000 shares
National City Bank N. Y.
1,000 shares
First National Bank of Atlanta
350 shares
Atlanta Baggage & Cab Co.
4,750 shares
Coca Cola Bottling Co. N. Y.
100,000 shares
Atlanta Biltmore Hotel
The outstanding year-end principal balances due on these notes from 1924 to 1933 were as follows: Date
Balance
12/31/24
$ 150,000.00
12/31/25
225,000.00
12/31/26
500,000.00
12/31/27
450,000.00
12/31/28
525,000.00
12/31/29
750,000.00
12/31/30
1,000,000.00
12/31/31
943,000.00
12/31/32
981,660.00
12/31/33
976,835.00
*76 On October 3, 1932, the various loans which petitioner had obtained from the First National Bank of Atlanta were consolidated and included in a renewal note in the amount of $981,660, which was executed by petitioner on October 3, 1932 and endorsed by William. Listed thereon as collateral securing this note, in addition to the stocks as listed above, were 1,000 shares of stock of Asa G. Candler, Inc. This note provided among other things as follows: ON DEMAND AFTER DATE we PROMISE TO PAY TO THE ORDER OF THE FIRST NATIONAL BANK OF ATLANTA Nine hundred eighty one thousand six hundred sixty and no/100 DOLLARS For Value Received At THE FIRST NATIONAL BANK OF ATLANTA, ATLANTA, GA, in gold coin of the United States, with interest after maturity until paid at eight per cent, per annum, * * *
The marker represents and covenants that the maker owns and has full power and authority to pledge the collaterals heretofore described, and any substituted and additional collaterals which may be given and hereby authorizes the payee or any holder of this note, or any officer, agent or attorney of such payee or holder, to collect, sell or otherwise dispose of the whole or any portion of said *77 collaterals or other property upon which the payee or holder hereof has a lien under the terms hereof, either at public or private sale and without notice to the maker of any intention to sell, or of the time and place of sale and without demand for payment of the note, upon default of the maker in the payment of any money due hereunder, or upon non-performance of this contract in any other respect by the maker, or upon the insolvency or bankruptcy of the maker, the net proceeds of any such sale or sales to be applied first to the payment of all indebtedness due hereunder, any surplus remaining to be accounted for to the maker, and the maker hereby authorizes the payee or any holder of this note to become the purchaser of such collaterals on its own account at any such sale or sales; and for the purpose aforesaid the payee or holder is authorized in the maker's name to sign and execute any transfer, conveyance or instrument in writing which may be necessary or lawful in the premises. If interest has been collected in advance, a rebate thereof at the same rate at which it was paid shall be allowed for the period of time for which interest was so paid in advance beyond the time the note *78 shall have been fully satisfied. Upon the satisfaction of this note, the payee shall have the right to retain the said collaterals, or any part thereof or any surplus derived from the sale thereof, to secure any other liability or obligation of the maker to the payee, now existing or hereafter created, whether as principal, indorser, guarantor or surety, and whether the same is due or to become due. Every power herein given is coupled with an interest and is irrevocable by death or otherwise. The note was under seal and signed on behalf of petitioner by William as its president. Asa G. Candler, Inc. (hereinafter referred to as AGC) is a corporation organized sometime prior to 1917 by Asa G. Candler, Sr. who was William's father. Asa G. Candler, Sr. was the controlling stockholder in the original Coca Cola Company of Georgia (dissolved prior to 1920), which during the years 1915, 1916 and 1917 made distribution in kind of various real and personal property. Asa G. Candler, Sr. organized AGC for the purpose of having it receive the property distributed to him by the Coca Cola Company of Georgia. In 1917 Asa G. Candler, Sr., conveyed by gift to his five children the entire outstanding *79 stock in AGC consisting of 25,000 shares. The children of Asa G. Candler, Sr. in addition to William, were Asa G. Candler, Jr., Walter T. Candler, Lucy C. Heinz and Charles Howard Candler, Sr. William and three of Asa G. Candler's other children each received 5,069 shares of AGC stock and the remaining 4,724 shares were issued to the fifth child, Asa G. Candler, Jr. After these gifts were made in 1917 and until about 1947 the only stockholders of AGC (except stock which petitioner herein acquired from William under circumstances hereinafter more fully set forth) were the five children of Asa G. Candler, Sr., and Charles Howard Candler, Jr., a grandson of Asa G. Candler, Sr. [1] At the date of the trial of this case the only child of Asa G. Candler who was still living was Walter T. Candler who at that time was in his mideighties and infirm. Charles Howard Candler, Sr. who was president of AGC for many years, including the year 1934, died in 1957. The directors of AGC in 1934 were the five children of Asa G. Candler, Sr. *80 During July 1947, following its investigation of the affairs and assets of AGC, Emory University, a non-profit corporation which operates Emory University located near Atlanta, Georgia, acquired the entire capital stock of AGC. Since its acquisition of this stock, Emory University has controlled and dominated the activities of AGC. At a special meeting of the stockholders and directors of AGC held September 12, 1928, with all stockholders present in person, the following resolution was unanimously adopted: Be it resolved that the Officers of this Corporation are hereby authorized and instructed to arrange for and make a loan or series of loans, payable on demand, to Callan Court Co., Inc. aggregating not in excess of $2,500,000.00, in consideration for which loan or loans Callan Court Co., Inc. will agree as follows: 1st: To secure said loan or loans by personal indorsement of its President, William Candler, and furnish collateral to be attached to the loan or loans consisting of capital stock of Asa G. Candler, Inc. and such other collateral which it may own, which may be acceptable to the Officers of Asa G. Candler, Inc. 2nd: That Callan Court Co., Inc. will pay all costs *81 incurred by Asa G. Candler, Inc. in placing any necessary first mortgages on any of its unencumbered real estate for the purpose of making this loan or loans, and that in no event will the rate of interest on said loan or loans to Callan Court Co., Inc. be less than 5%, payable semi-annually, January 1st and July 1st of each year. 3rd: That Callan Court Co., Inc. will cause to be passed at a duly and properly called meeting a resolution that it will adopt and pursue a policy of orderly liquidation to the end that its borrowing from Asa G. Candler, Inc. may be liquidated at the earliest possible date, and that it will furnish a duly certified copy of such resolution to Asa G. Candler, Inc. for its files. 4th: That Callan Court Co., Inc. will obtain from its President a written agreement that he will not change or cause to be changed the present beneficiary, namely, Callan Court Co., Inc., of any of the life insurance policies which Callan Court Co., Inc. is carrying at this time aggregating $1,000,000.00 upon the life of its President so long as Callan Court Co., Inc. is indebted to Asa G. Candler, Inc., and that a certified copy of this agreement will be furnished Asa G. Candler, *82 Inc. for its files. At a special meeting of the directors of petitioner held September 17, 1928, a resolution authorizing petitioner to borrow an amount not exceeding $2,500,000 from AGC in accordance with the terms set forth in the resolution adopted by AGC and to furnish as collateral 5,000 shares of the stock of AGC and such other collateral as may be acceptable to the officers of AGC was passed. At the meeting it was further resolved: * * * That the President and Treasurer of this Company (Callan Court Company) be and he is hereby authorized, empowered and instructed to accept the offer of William Candler to transfer his entire holdings of Asa G. Candler, Inc., stock to the Company (Callan Court Company) provided Callan Court Company would in turn assume one million ($1,000,000) dollars of the indebtedness of William Candler. In accordance with the authorization at the September 17, 1928 meeting of petitioner's directors, William transferred his 5,069 shares of AGC stock to petitioner. A journal entry showing the transfer of this stock at a value of $400 per share was made on petitioner's books under date of September 29, 1928. Under date of November 1, 1929 an entry on petitioner's *83 journal shows "sale to Mr. Candler of 69 shares of Asa G. Candler stock at $400.00 per share." After adoption of the resolution of September 17, 1928 petitioner proceeded to borrow $2,500,000 from AGC. Petitioner pledged and delivered as security for the note evidencing such loans 5,000 shares of the AGC stock transferred to petitioner by William, together with stock owned by petitioner in other companies. William personally endorsed the note. On November 13, 1929, AGC released to the First National Bank of Atlanta, 1,000 shares of the 5,000 shares of AGC stock held by AGC as collateral for petitioner's notes in order that such 1,000 shares could be pledged to the bank for the purpose of securing the outstanding note of petitioner payable to the bank which note was personally endorsed by William. The 1,000 shares of AGC stock were transmitted to the bank by a letter from AGC to the bank dated November 13, 1929, the body of which reads as follows: We are herewith releasing to you from our collateral, 1,000 shares of Asa G. Candler, Inc. capital stock, the property of William Candler, to be temporarily attached to your port-folio containing collateral against his loans with you. *84 It is understood and agreed that you will return this collateral to us, when his loan with you is sufficiently secured. At a special meeting of the stockholders of AGC held January 23, 1931, with all stock being represented in person [the minutes show William with 5,069 shares] the following resolution was unanimously adopted: RESOLVED, by the stockholders of Asa G. Candler, Inc., that the President of this Company be and he is hereby authorized to enter into a contract with the First National Bank of Atlanta, by which this Company shall become obligated, if called upon so to do by the said Bank, to purchase from it at any time after two years from this date 1,000 shares of stock of Asa G. Candler, Inc., certificate No. 6, at the price of $600.00 per share, or the total purchase price of $600,000.00, or to advance or lend to Callan Court Company on said stock the said amount of money, which said money when so borrowed by Callan Court Company shall be used to pay off a corresponding amount of its indebtedness to the First National Bank of Atlanta now secured by said stock. The minutes contain no explanation of the reason for the adoption of this resolution other than the statement *85 "the stockholders being apprised of the purpose of the meeting". On February 4, 1931, AGC entered into an agreement with the First National Bank of Atlanta, which agreement recited that petitioner was indebted to the bank on two notes personally endorsed by William, that William had pledged with the bank as collateral 1,000 shares of AGC stock and that "in consideration of the sum of TEN ($10.00) DOLLARS to it in hand paid by said Bank at and before the sealing and delivery hereof, the receipt of which is hereby acknowledged, and in consideration of the agreement of said Bank to renew the above-described notes for a period of not less than thirty (30) days from their present due dates, [AGC] agrees to purchase the said ONE THOUSAND (1,000) shares of the capital stock of ASA G. CANDLER, INC., represented by Certificate No. 6, if called upon so to do by said Bank at any time after two years from the date hereof at the price of SIX HUNDRED ($600.00) DOLLARS per share, or a total purchase price of SIX HUNDRED THOUSAND ($600,000.00) DOLLARS, payable in cash, or, at the option of said Bank, to advance or loan to Callan Court Company on said stock the said amount of money, which said *86 money when so borrowed by Callan Court Company shall be used to pay off a corresponding amount of its indebtedness to said bank now secured by said stock." The agreement provided that the bank might renew or extend in whole or in part the notes without affecting or altering the agreement. At a meeting of the board of directors of AGC held December 26, 1931, AGC was authorized to appropriate, in satisfaction of the indebtedness of petitioner to AGC, the shares of AGC stock pledged by petitioner at that time to AGC as security. The following appears in the minutes of the meeting of the board of directors which showed all directors, who were William, his three brothers and his sister, as being present at the meeting. Discussion was held in the matter of the demand notes of Callan Court Company held by the Company aggregating $2,500,000.00. Attention was directed to the fact that interest past due on these notes aggregated $254,750.00, only $7,250.00 of interest for the year 1930 having been paid out of a total due annually of $131,000.00 and none having been paid for 1931. It was pointed out that it is impossible to realize on either defaulted interest or principal of these notes, *87 our formal demand for payment dated December 15, 1931 not having been complied with. As the notes were due on demand and were secured by 5,000 shares of the Capital Stock of Asa G. Candler, Inc., issued in the name of William Candler, it was recommended that this stock be appropriated in satisfaction of the debt and held as Treasury Stock and that the Company accept its loss represented by the difference between the book value of this stock as shown by the auditors' report at the close of the preceding year and the amount of the notes which represented advances made to Callan Court Company totaling $2,500,000.00. Note was made of the fact that 1,000 shares of this Capital Stock held as collateral on the notes of Callan Court Company had been lent to the First National Bank of Atlanta to further secure loans to Callan Court Company by the Bank. Under the terms of an agreement with the First National Bank of Atlanta, authorized at a special meeting of the Stockholders of Asa G. Candler, Inc. held January 23, 1931, the Company guaranteed payment of the loan, up to $600,000.00, at any time after two years to the extent that collateral held by the Bank failed to secure the loan. The agreement *88 further provided that upon such payment or upon the Bank's securing otherwise sufficient collateral for the loan in the meantime, the 1,000 shares so lent to the Bank was to be returned to the Company. Upon motion of Walter T. Candler, seconded by Mrs. Lucy C. Heinz, and unanimously carried, the foregoing recommendations were adopted and the President was instructed to appropriate the 5,000 shares of Capital Stock held as collateral on the notes of Callan Court Company to the Company's Treasury, and have the proper entries made on the books and records of the Company to reflect this transaction. On March 2, 1933, pursuant to authorization granted at a joint meeting of the stockholders and directors of AGC, the contract whereby AGC agreed to purchase the 1,000 shares of AGC stock under the terms hereinbefore set forth was amended to extend the period of time after which the purchase would be made as called for from 2 to 3 years. The minutes of the special meeting on March 2, 1933 of the stockholders and directors of AGC, at which all stockholders were present, which authorized this action also showed the following action as taken: Walter T. Candler offered to sell to the Corporation *89 100 shares of the capital stock of the Corporation for $45,890.00. Upon motion of Mrs. Lucy C. Heinz, seconded by Asa G. Candler, Jr., and unanimously carried, the officers of the Corporation were authorized to purchase this 100 shares of capital stock of the Corporation and to hold the same as Treasury stock. Entries were made in petitioner's journal on the dates and for the stated purposes as follows: Date
Purpose
December 31, 1929
To write up AGC stock $100 per share.
January 27, 1930
To write the cost of AGC stock up to $900 per share.
March 31, 1930
To write up the cost of AGC stock from $900 to $1,000 per share.
November , 1930
To reduce book value of AGC stock from $1,000 to $100 per share.
December 26, 1931
To record appropriation by AGC of 5,000 shares of AGC stock in satis-
faction of notes due them aggregating $2,500,000 on which interest
has not been paid for two years.
The following entries were made in petitioner's ledger with respect to AGC stock: Date
Dr.
Cr.
Balance
9/29/28
2,027,600.00
2,027,600.00
11/ 1/29
27,600.00
2,000,000.00
12/31/29
500,000.00
2,500,000.00
1/27/30
2,000,000.00
4,500,000.00
3/31/30
500,000.00
5,000,000.00
11/ /30
4,500,000.00
500,000.00
12/26/31
500,000.00
0
*90 In early February 1934 the bank called upon AGC to purchase the 1,000 shares of AGC stock in accordance with its agreement as extended. At a joint meeting of its stockholders and directors at which all were present in person held March 26, 1934, AGC was authorized to conclude a settlement with the bank with respect to its agreement to purchase the 1,000 shares of AGC stock. The minutes of this meeting state in part as follows: The President outlined the essential features of numerous conferences over the past several weeks between the officials of this Company and those of The First National Bank of Atlanta concerning an alleged obligation of this Company to the Bank, and also negotiations with the Bank concerning a loan for the benefit of Walter T. Candler. Upon full discussion of the matters, the following resolution, prepared by attorneys for The First National Bank, was offered by Asa G. Candler, Jr., seconded by Mrs. Lucy C. Heinz, and unanimously adopted: WHEREAS, under date of March 17, 1934, this corporation by an instrument in writing, signed by its officers and directors who own all of the capital stock of the corporation, made a proposition to The First National Bank *91 of Atlanta in words and figures as follows, to-wit: "We, the undersigned, make the following proposition to The First National Bank of Atlanta: "1. In consideration of the surrender and cancellation of the alleged obligation of Asa G. Candler, Inc. to buy 1000 shares of Asa G. Candler, Inc. stock held by The First National Bank of Atlanta as collateral to a note of Callan Court Company, endorsed by William Candler; said contract calling for the purchase of said 1000 shares, the price and said repurchase agreement being in the sum of $600,000.00; we agreeing to pay $450,000.00 for same." "2. The sale and transfer to Asa G. Candler, Inc. of the above described note of Callan Court Company, endorsed by said William Candler, the note being dated October 3, 1932, and the balance on the principal amount being $976,835.00. Said The First National Bank to retain such other collateral which it holds against the said note of the Callan Court Company after a credit has been endorsed on said note of $450,000.00 and after a credit has been endorsed in the sum of $200,000.00 being the estimated value of said stocks held by said bank as collateral to said note other than the contract and stock *92 of Asa G. Candler, Inc. of 1000 shares;" "3. AND in the further consideration that The First National Bank of Atlanta will agree to sell, assign, and transfer without recourse a note or notes of Walter T. Candler in the sum of $400,000.00, secured by certain Certificate of stock of Asa G. Candler, Inc., representing 4069 shares, at and for a sum of $400,000.00;" "4. AND the further consideration that The First National Bank will lend Asa G. Candler, Inc. the sum of $850,000.00 for a term of five years at 3% per annum, payable semi-annually, secured by improved real estate in an amount satisfactory to The First National Bank, together with the necessary title and papers to be approved by Brandon and Hynds. * * *
and WHEREAS, the said proposition was accepted by the Bank in its communication dated March 21st, 1934 * * * [the letter to AGC from the Bank was quoted in full] * * *
Following discussion of the loan which is being made to this Corporation for the benefit of Walter T. Candler, the following resolution was offered by Mrs. Lucy C. Heinz, seconded by Asa G. Candler, Jr., and unanimously adopted: WHEREAS, Asa G. Candler, Inc., has purchased from The First *93 National Bank of Atlanta a note or notes of Walter T. Candler for the principal sum of $400,000.00, and WHEREAS, said purchase was made at the request of the said Walter T. Candler and upon his express acceptance of a proposal in writing made by Chas. Howard Candler, Asa G. Candler, Jr., Lucy Candler Heinz and Wm. Candler to give to Asa G. Candler, Inc., certain additional security for said indebtedness if it would purchase the same from the said The First National Bank of Atlanta as per Exhibit A, and WHEREAS, in order to get money with which to make said purchase, the said Asa G. Candler, Inc., did execute and deliver to the said The First National Bank of Atlanta a promissory note for $850,000.00, due five (5) years after date, with interest from date at 3% per annum, payable semi-annually, out of the proceeds of which said loan the note of Walter T. Candler was purchased, and WHEREAS, the said Walter T. Candler admits and recognizes that said indebtedness to the said The First National Bank of Atlanta by Asa G. Candler, Inc., was made for his benefit and at his request up to the principal sum of $400,000.00 thereof. NOW, THEREFORE, BE IT RESOLVED, that this Company deliver *94 to the said Walter T. Candler his note of $400,000.00 purchased by it as aforesaid, upon and in consideration of the said Walter T. Candler assuming and agreeing with Asa G. Candler, Inc., that he will pay $400,000.00 principal of this Company's indebtedness to The First National Bank of Atlanta and the interest payments on such $400,000.00 from time to time as they mature under the terms of the agreement between this Company and The First National Bank of Atlanta, and upon his giving to Asa G. Candler, Inc., the same security for the carrying out of said contract of assumption as he offered to give if this Company would purchase and hold his note aforesaid; it being the intent and purpose of this resolution that instead of being indebted to this Company for $400,000.00, the said Walter T. Candler shall assume and become indebted to The First National Bank of Atlanta for that amount and shall protect and guarantee this Company against any liability or obligation on its part as to the repayment of said $400,000.00 and the interest thereon. There were no references in the minutes of the stockholders and directors of AGC of March 26, 1934 to petitioner's note other than those quoted *95 and those contained in the letter from the bank set forth in full in those minutes. In the transaction effected between AGC and the bank on March 26, 1934, the bank took ownership and title to all collateral with the exception of the 1,000 shares of stock of AGC which secured petitioner's note to the bank in the then principal amount of $976,835, the reduced amount resulting from reductions in principal under dates of January 4, April 4, July 3, and October 3, 1933 from dividends on stock held as collateral. The bank credited the principal of the note with $200,000 and endorsed the note without recourse to AGC and delivered the note and certificate of AGC stock to AGC. These actions by the bank were pursuant to a contract between it and AGC and the taking by the bank of ownership of the collateral was pursuant to the powers contained in the note. [2]
*96 On the date that AGC took ownership of and title to the 1,000 shares of AGC stock, it had the following journal and ledger entries made on its books of account to record the transactions. Journal
4/26/34
(Folio 1318)
Profit & Loss
$450,000.00
Notes payable - First National Bank of Atlanta
$450,000.00
(Loss on note of Callan Court Co. to First Na-
tional Bank on which AGC Inc. was guarantor.)
Ledger
NOTES PAYABLE - FIRST NATIONAL BANK OF ATLANTA
Note dated 3-28-34 - 3% SA - Due 3-28-39
Date
Folio
Dr.
Cr.
4/26/34
1318
$450,000.00
No entry was ever made on the books of AGC to record as an asset the note of petitioner transferred to AGC by the bank. The note of AGC to the bank was paid in full by AGC in 1939. The $400,000 note of Walter T. Candler which was transferred without recourse by the First National Bank of Atlanta to AGC as part of the agreement of March 26, 1934 was satisfied in 1939 by payment by Walter Candler to AGC of the $400,000 balance. An official meeting of the directors of petitioner was held on March 27, 1934, at which a resolution was passed whereby petitioner consented to the bank taking over the *97 stock it had pledged to secure its note other than the AGC stock or becoming the purchaser thereof for the sum of $200,000, which amount was to be credited on the note and assigning and surrendering the stocks and the certificates representing the stock, other than the 1,000 shares of AGC stock to the bank. This resolution further stated: It is expressly agreed that neither said sale nor anything herein contained shall be construed as releasing the undersigned, either as maker or endorser, for the liability for the balance of said note, or shall in any wise alter or affect the responsibility of the undersigned for the payment thereof. At the meeting of the stockholders and directors of AGC on January 24, 1935, there was presented to the stockholders and directors an audit report for its calendar year 1934 prepared by a certified public accounting firm. This report was received and ordered filed at that meeting. The report contained a detailed list of the assets and liabilities of AGC as of December 31, 1934, included in which were notes receivable in the amount of $83,629.98. The details of these notes were listed on a schedule attached to the report. None of the notes so listed *98 was petitioner's note which had been transferred by the bank to AGC as heretofore stated. Notes payable by AGC were likewise listed in detail in a schedule attached to this report and among these notes listed was a note to the First National Bank of Atlanta, Georgia, in the amount of $450,000 which was the only note to the First National Bank of Atlanta listed on the schedule. This audit report showed total income and profits of $148,440.94, total expenses and losses of $765,023.03 with a resultant loss for the year 1934 of $616,582.09. Included in the $765,023.03 of expenses and losses was an amount of $450,000 listed as "Loss as Guarantors on Notes of Callan Court." Reference was made in the minutes of January 24, 1935 to permitting Walter Candler to draw certain amounts from deposits with AGC from rents under a lease which had been assigned to AGC in connection with this $400,000 indebtedness to AGC but no mention was made of petitioner's note assigned to AGC by the bank. In its Federal income tax return for the calendar year 1934 AGC took a loss in the amount of $450,000, which was described as "Loss as guarantors on Notes of Callan Court Company." After the transactions between *99 the First National Bank and AGC with respect to petitioner's note, that note, together with the contract between AGC and the bank, the correspondence relating thereto, and an office memorandum dated March 13, 1934, signed by Charles Howard Candler, the then president of AGC, were placed in a letter file of AGC. Such file, following the audit of AGC's records for 1934 by its certified public accountants, was placed in the files of AGC where it remained until the date of the trial of this case. Notes payable to AGC are not normally kept by AGC in a letter file. AGC normally keeps active notes in the safe in its office. The office memorandum which was contained in the file along with the contract and correspondence and the note reads as follows: This memorandum is to record my recollection of the circumstances under which Mr. T. K. Glenn obtained a certain alleged agreement dated February 4, 1931 from Asa G. Candler, Inc. Mr. Glenn called me to his office some weeks prior to the date of the alleged agreement and said that the notes of Callan Court Company, endorsed by William Candler, then held by The First National Bank of Atlanta, had attached to them as collateral, securities, *100 the value of which it was difficult to appraise as the stocks were those of, in several instances, closely held corporations for which no market existed. He was cognizant of the fact that on November 13, 1929 at the request of Mr. Henry J. Davis, then Vice-President of the Atlanta and Lowry National Bank, I had released from our collateral 1000 shares of Asa G. Candler, Inc. capital stock, the property of William Candler to be temporarily attached to the Bank's portfolio containing collateral against William Candler's loans with the Bank, and that Mr. Davis had agreed to return this 1000 shares of Asa G. Candler, Inc. stock to us when the William Candler loans with the bank were sufficiently secured. Mr. Glenn observed to me that the Bank was being criticized by the Bank examiners because it was unable to furnish the examiners reliable or definite information as to the value of some of the securities, particularly the Asa G. Candler, Inc. stock attached as collateral against William Candler's loans. He pointed out that there had never been any record of any sale of the stock of our Corporation at any time, that our statement was not published and that nobody knew the value of our *101 stock. I told him at that time that I considered it to be worth $600.00 per share. He stated it would help them very much with the Bank examiners if I would furnish him such a statement in writing for their files to be exhibited to the bank examiners - This I did. Some weeks thereafter Mr. Glenn asked me to another conference, at which time he stated that the examiners were not satisfied with my opinion as to the value of our stock, but could be satisfied with an offer to buy the stock within a certain stipulated period of time, explaining very definitely that such an offer to buy would never be availed of but would merely be used to satisfy the Bank examiners. Indeed he expressed the conviction that other stocks, collateral against William Candler's loans, would enhance so much and so rapidly in value that before the expiration of the time stipulated in the alleged agreement, the Bank would in compliance with its agreement, return to us the 1000 shares of Asa G. Candler, Inc. stock which we had loaned it on November 13, 1929. The depression, which caused the drastic decline in stock values, had already lasted more than a year, economists, bankers and others were frequently expressing *102 the opinion that it would soon be over and I, myself, was inclined to agree with Mr. Glenn that the recovery could be confidently expected before the lapse of a two year period, and accordingly consented for my Company to agree to buy 1000 shares of its capital stock at $600.00 per share at any time after the lapse of a two year period. The alleged agreement was extended for a period of another year for the same reason. All of us confidently expected the depression would soon be over, its bottom having been reached during the summer of 1932, and with recovery the Willian Candler loans would be sufficiently secured to permit the return to us under our agreement of the 1000 shares of our stock. It was never contemplated by Mr. Glenn, Mr. Ottley or myself that we would ever be called upon to purchase our own stock, which had been loaned as an accommodation to the Bank. The sole purpose of the alleged agreement and its extension was to furnish information upon which could be based a valuation of the stock by the bank examiners. At all times during the years 1932, 1933 and 1934 petitioner was insolvent and William was insolvent. From March 26, 1934 until January 1, 1948 the outstanding *103 balance of notes payable to the First National Bank was shown on petitioner's books to be $776,835, and on petitioner's Federal income tax returns for the calendar years 1934 through 1947 a liability on this note in the amount of $776,835 was shown on the balance sheet included in each return. No entries were made on petitioner's books from July 1, 1937 to January 1, 1948. Between March 26, 1934 and January 1, 1937 there were some rents collected from old buildings owned by petitioner but these rents were actually paid to the mortgage company holding the mortgages on those buildings. By the end of 1936 petitioner no longer owned any of these buildings. On February 25, 1932, the Citizens and Southern National Bank, as trustee of the mortgage securing the bond issue of Biltmore, instituted equitable foreclosure proceedings against Biltmore in Fulton County, Georgia, Superior Court, and a receiver was appointed by that Court for Biltmore. Petitioner intervened in the proceedings, claiming to be a bondholder by virtue of reissuance to it of bonds of Biltmore which had been acquired by it, then cremated and reissued. From an adverse decision of the Superior Court of Fulton County petitioner *104 appealed to the Supreme Court of Georgia, which ruled against petitioner's contention. On January 27, 1937, prior to the decision of the Supreme Court of Georgia in these proceedings, Biltmore filed a petition for reorganization under section 77-B of the Bankruptcy Act in the District Court of the United States for the Northern District of Georgia. On motion by Biltmore in the suit pending in Fulton County Superior Court, that Court on March 25, 1937 entered an order staying the State Court proceeding. By decree of the United States District Court in the bankruptcy proceedings Biltmore was reorganized. The successor company, Atlanta Biltmore Hotel Corporation received the assets of Biltmore and continued operations. In the reorganization of Biltmore on July 1, 1937, preferred stock of the reorganized company in a substantial amount was issued to petitioner. This stock was not entered on petitioner's books until January 1, 1948, at which time the stock was entered on petitioner's books and the following entry was made on petitioner's journal: 1/1/48
Notes Payable - First National Bank
$776,835.00
Capital Surplus
$776,835.00
On March 23, 1934 the First National Bank credited the note
they held in the amount of $976,835.00, with $200,000.00
(see J-242) took over all collateral on the note except
Asa G. Candler stock and delivered the note to Asa G.
Candler, Inc., together with the 1,000 shares of Asa G.
Candler Stock, which the bank was holding as collateral.
Asa G. Candler, Inc. received and held the 1,000 shares
as payment of the note by further appropriation (the
1,000 shares having been included in the 5,000 shares
appropriated Dec. 26, 1931 - See J-215.)
*105 The bookkeeper for petitioner who made this entry and who is now petitioner's bookkeeper and who has been employed by petitioner since April 1, 1925, made an entry on petitioner's books after March 26, 1934 to reflect the $200,000 credit on the note by the First National Bank and thereafter made no entries on petitioner's books until January 1, 1948, because be considered petitioner to be "dead". Petitioner's bookkeeper was of the opinion that the bondholders of the reorganized Biltmore would never be paid the entire amount due them and any stock of the new corporation was valueless. Petitioner's bookkeeper made the entry dated January 1, 1948, with respect to petitioner's note to the First National Bank in accordance with his understanding of statements made by William prior to William's death in late 1935. The bookkeeper did not discuss the making of this entry with officials of petitioner and was not given any specific authorization to write off the note by petitioner's officials. No corporate action was taken by petitioner with respect to this write off. Petitioner's bookkeeper was the person who prepared petitioner's Federal income tax returns for the years 1934 through 1937. *106 From the date that petitioner's note was given to the First National Bank on October 3, 1932, until March of 1934, petitioner received monthly notices of interest due on the note. Interest was billed to petitioner by the bank at 6 percent per annum. Interest payments were made by petitioner to the bank on various dates during the period from October 3, 1932, through February 1934. The following notations as to these interest payments were made on petitioner's note to the bank: 29 da 981,660.00 at 6
4,744.66
30 da 981,660.00 at 6
4,908.30
31 da 981,660.00 at 6
5,071.94
31 da 981,660.00 at 6
5,071.94
28 da 981,660.00 at 6
4,581.11
31 da 981,660.00 at 6
5,071.94
30 da 981,660.00 at 6
4,908.30
From the date of the transaction between the First National Bank and AGC on March 26, 1934, until the date of the trial of this case petitioner received no notice of interest due or demand or any notice of any kind with respect to the note assigned by the bank to AGC. Throughout the years 1952, 1953, and 1954 petitioner's net worth exceeded $776,835. Respondent in his determination of deficiency increased petitioner's taxable income as shown on its returns, which *107 for each of the years 1952 and 1953 was a loss of $800 and for the year 1954 was zero, by $776,835, making the following explanation for 1954: It is held that you realized taxable income in the taxable year ended December 31, 1954, in the amount of $776,835.00 representing the unpaid principal amount of a note dated October 3, 1932 of $981,660, as the result of your assets being freed from liability for the payment of that amount due to the failure of the holder of such note to act within the statutory period to effect the collection thereof, thereby making available to you a defense against payment. Your taxable income has been increased, therefore, by $776,835.00. For the years 1952 and 1953 respondent made the explanation that if the determination for the taxable year 1954 is not finally sustained, but only in such event, then it is held, in the alternative, that the statutory period to effect collection of the note expired in that year. For the years 1952 and 1953 the deficiency as determined included excess profits tax in the amount of $139,686.30, but on brief respondent conceded error in this determination. Opinion Petitioner's primary position in this case is that petitioner's *108 note was satisfied in full in 1934 when AGC took over the 1,000 shares of stock on March 26, 1934, did not enter the note on its books of account or otherwise on its records as an asset, made no demand of petitioner for payment, showed a loss from the transaction on its books and claimed a loss therefrom on its 1934 income tax return, and put the note with the correspondence relating thereto in a letter or correspondence file following the filing of the audit report of its accountants for the year 1934. In the alternative petitioner contends that if the note were not satisfied in full in 1934 the statute of limitations on its collection did not run in 1952, 1953 or 1954. In the further alternative petitioner contends that an additional credit of $450,000 is required on the note as of March 26, 1934, because of the First National Bank in effect selling the 1,000 shares of AGC stock held by it as collateral for that amount. It is respondent's position that the note was not satisfied in 1934, that no credit is allowable on the note because of the disposition made of the 1,000 shares of AGC stock, and that under Georgia law the statute of limitations on the collection of the note expired *109 in 1954 or in the alternative in 1952 or 1953. Respondent takes the position that AGC was the owner of the 1,000 shares of AGC stock which the bank held as collateral to petitioner's note and that therefore the $450,000 paid the bank by AGC was in effect for purchase of the note from the bank or as a guarantor's payment thereon. Respondent points out that the discharge of an indebtedness in whole or in part may result in the realization of income to a taxpayer as a result of having its assets released from liability and thereby increasing its net worth. . Respondent recognizes, however, that if a taxpayer is insolvent, both before and after the cancellation of an indebtedness, such cancellation does not result in taxable income. . Respondent further recognizes that the expiration of the statute of limitations on a debt is not decisive of when such debt is canceled, but contends that under the facts here present the year in which the statute of limitations bars the collection of the liability represents the time when the debt was in effect canceled by the creation *110 of a defense to its collectibility. (S.D., N. Y., 1948). See also , affirmed per curiam, (C.A. 9, 1948). In Policy Holders Agency, Inc. [Dec. 26,351], , we held that the year in which an amount, set up on that taxpayer's books as an account payable because of unclaimed premium refunds, constituted income was a question of fact to be determined from the evidence, and that the year of the expiration of the statute of limitations on the collection of such unclaimed premium refunds from that taxpayer was not controlling. In that case we concluded from the evidence that the year in which it became reasonably certain that the amount no longer constituted a liability of that taxpayer was prior to the year of the expiration of the statute of limitations on the collectibility of the unclaimed premium refunds. Respondent recognizes in accordance with our holding in Policy Holders Agency, Inc., supra, that the year of the expiration of the satute of limitations is not conclusive as to the year in which an amount *111 which had at some time been an indebtedness should be restored to income but contends that under the facts here present there was no year prior to that of the expiration of the statute of limitations when petitioner's note to the First National Bank could be considered as satisfied or canceled. Whether or not the indebtedness of petitioner on its note to the First National Bank was in effect canceled or satisfied when AGC paid $450,000 to the bank and wrote the amount off its books as a bad debt is the ultimate fact to be determined from all the evidence in this case. Upon consideration of all the evidence, we conclude that petitioner's indebtedness on its note to the First National Bank was satisfied or canceled in 1934. We recognize that there are certain deficiencies in the evidence which could only be supplied by persons who participated in the transactions that occurred in 1934. The record shows that all of these individuals, with the exception of one, are dead, and the one living individual is in his mid-eighties and infirm. We likewise recognize that respondent's determination is prima facie correct and that it is incumbent on petitioner to show error therein and that petitioner *112 is not excused from the discharge of this burden because of the unfortunate circumstances of no person who participated in the transaction now being available as a witness. Without considering this lack of availability of witnesses except as an explanation for their failure to testify, we have concluded from the evidence presented in this case that the presumption of correctness attaching to respondent's determination has been overcome by petitioner and upon weighing the evidence have concluded that the preponderance favors petitioner's position. The various actions taken by AGC as shown by its minutes of directors and stockholders meetings, both with respect to loans to petitioner and with respect to transactions with other members of the Candler family, indicate that the primary reason that AGC released the 1,000 shares of stock to the First National Bank to insure petitioner's note was a family desire by the stockholders to be of assistance to their brother William in his financial difficulties. We likewise conclude that when this stock was transferred to it and the note assigned to it, AGC considered the entire transaction closed when it wrote off the $450,000 as a bad debt. *113 The witness Charles H. Candler, Jr., who had been employed by AGC since shortly after graduation from college in 1926 testified to this effect. We recognize that this witness was not a stockholder or director of AGC during the period 1927 through 1934 and that any information he had was acquired from his general association with AGC and therefore would give very little weight to his testimony if we did not consider it supported by the other evidence of record. During the years here involved AGC, though legally a corporation and operating as such, represented in reality a portion of the wealth of William's family consisting of three brothers and a sister. That the actions taken were in many instances motivated by family considerations is shown not only by the loans made to William and the release of AGC stock to the bank on his behalf, but also by a purchase of stock from Walter and the purchase of Walter's note to the First National Bank. Many of the corporate actions as recorded in the corporate minutes can be explained only as brothers and a sister assisting each other with financial problems. Respondent points to the actions in the corporate minutes when the 5,000 shares of *114 AGC stock pledged for petitioner's $2,500,000 loan from AGC were appropriated in satisfaction of that loan as indicating that it must not have been the intent of AGC to consider petitioner's note of October 3, 1932, canceled or satisfied when AGC paid the First National Bank $450,000 and received the 1,000 shares of AGC stock and petitioner's note from the bank. We gather no such inference. AGC's offer to the bank was in terms of $450,000 in addition to the $200,000 being credited on this note. While the bank's acceptance did not repeat these terms, the offer of AGC indicates that it viewed the amount as a guarantor's payment on the note in return for which it was to receive the 1,000 shares of AGC stock pledged as collateral. When this statement is considered in conjunction with the fact that there was no statement in the minutes of March 26, 1934, with respect to petitioner's note as there was with respect to Walter's note that it was to be paid by the primary obligor, we consider the inference to be that it was not intended that petitioner would make any payment on the note. The inference that AGC considered the transaction as closed in 1934 is further borne out by the write-off *115 of the debt in that year. In the audit report by the CPA firm as of the end of 1934 petitioner's note was not shown as an outstanding obligation to AGC, but the payment by AGC to the bank was shown to result in a deductible loss of $450,000. Respondent attempts to explain this deduction of the $450,000 in 1934 by AGC as motivated by a desire to reduce its income taxes. No such inference properly follows from the write-off in 1934 since in that year AGC sustained a loss even without this deduction. We agree with petitioner that the fact that Emory University, after an investigation of AGC's affairs, acquired the stock in 1947 while the statute of limitations with respect to petitioner's note was open but made no effort to collect the note or any demand for payment of the note, indicates that the note was considered satisfied or canceled by AGC prior to 1947. Charles H. Candler, Sr., who was president of AGC for many years and was president at the time of the transaction here involved did not die until 1957, approximately 10 years after the time the stock of AGC was acquired by Emory University, and Walter Candler would have been approximately 18 years younger at the time Emory University *116 acquired this stock than at the date of this trial. It is a fair inference that the investigators for Emory University would have ascertained from one of these stockholders of AGC that petitioner's note had not been satisfied or canceled and was a possible asset of AGC if such had been the fact. Bookkeeping entries are not conclusive but can be considered along with all other available evidence in determining factual questions of whether income has resulted from cancellation of an indebtedness. Petitioner's records showed a liability on its note to the First National Bank in the amount of $776,835 from the time the note was written down by $200,000 in 1934 until the entry made on January 1, 1948. However, the bookkeeper explained that the entry showing satisfaction of the note was not made prior to 1948 since he had viewed petitioner as dead. The bookkeeper testified that he made the entry from his understanding of the transaction received from William prior to William's death in October 1935. [3] It was not until January of 1948 that the bookkeeper entered the stock of the reorganized Biltmore *117 received by petitioner in 1937 on petitioner's books. Respondent's argument is to a large extent based on petitioner's burden of proof, not only because of the presumption of correctness of his determination in the notice of deficiency but also the presumption which respondent in effect contends exists that the note had not been satisfied or canceled because of the fact that it had not been marked canceled or paid or returned to the maker but had been left in a letter file of AGC with no specific written discharge contained in the official records of either AGC or petitioner. The failure to make some specific notation on petitioner's note is evidence to be considered in determining whether it had been canceled or satisfied, but the lack of such a written notation is not conclusive either for income tax purposes, see , or under Georgia law. See *118 (Ct. Apps. of Ga., 1934), and (S. C., Ga., 1941). Respondent further contends that petitioner in its minutes of March 27, 1934, which was one day after the meeting of AGC's stockholders and directors authorizing the agreement with the First National Bank specifically acknowledges its indebtedness on the note in excess of the $200,000 credited thereon by the bank when it took over the collateral other than the 1,000 shares of AGC stock. This statement in the minutes loses its significance when considered in the light of the fact that the transaction between the bank and AGC was not finally concluded until March 28, 1934, which is shown by AGC's ledger to be the date on which it gave its note for the $450,000 to the bank. This statement is likewise of little significance if the payment by AGC to the bank is viewed as being made by a guarantor with the unpaid balance after such payment being canceled by the bank. We recognize that such was not the form of the transaction in March 1934. However, the entire surrounding circumstances of the transaction cannot be reconciled with any intention on the part *119 of AGC to make a profit by acquiring petitioner's note for less than its face amount. The inference that AGC certainly did not consider after the transaction in March 1934 that petitioner was indebted to it for any amount in excess of the $450,000 it had paid to the bank is much stronger than the inference that the $450,000 paid by AGC was not considered an indebtedness which was not satisfied or canceled. In concluding that the preponderance of the evidence supports this latter conclusion we have considered, among others, the facts in the record that indicate that the 5,000 shares of AGC stock appropriated by AGC on December 26, 1931, with notation of the fact that 1,000 shares of this stock was held as collateral by the First National Bank might have been worth more than $2,500,000 at the time appropriated. Certainly the guarantee given to the bank in January 1931 would indicate that at that time AGC considered the stock as worth $600 a share. We have also considered the fact that AGC did not demand that petitioner either pay the note or deposit with AGC as collateral the Biltmore stock petitioner acquired in July 1937. Even though the officers of AGC might have considered the Biltmore *120 stock to be worthless as did petitioner's bookkeeper, it was petitioner's only possible asset. Petitioner was aware that in March 1934 the bank had endorsed its note without recourse to AGC since at the time this transaction occurred William was a shareholder and director of AGC and attended all the meetings concerning the transaction. The record shows that petitioner's officers knew after March 1934 that petitioner had no indebtedness to the bank on the note. The fact that petitioner's books and income tax returns showed the outstanding balance of notes payable to the First National Bank to be $776,835 without notation as to the assignment of the note minimizes any significance to be given to these notations and to the lack of other entries with respect to the note being made on petitioner's books prior to 1948. Since in our view the evidence is sufficient to show that petitioner's note was satisfied or canceled by AGC when AGC acquired it from the bank, we need not consider petitioners alternative contention that the statute of limitations has not run on this note since no actual demand has been made since March 26, 1934, for payment thereof, or its further alternative contention *121 that at least $450,000 of the note was satisfied in 1934 by payment to the bank. Decision will be entered for petitioner. Footnotes
1. This statement is taken from the stipulation of facts filed by the parties. However, from minutes of AGC as late as January 24, 1935 it appears that William still owned 69 shares of AGC stock. There is nothing in the record to show the disposition of these 69 shares after William's death on October 2, 1935.↩
2. The words "that date" in the stipulation with respect to the date of the contract between AGC and the bank must refer to March 26, 1934. However, the following allegation in the petition is admitted in the answer: "* * * an agreement dated March 28, 1934 was executed, agreed to by AGC, the bank, Callan and Candler, pursuant to which the bank took over all of the said collateral securing said note of Callan, with the exception of said 1,000 shares of AGC stock."↩
3. The witness actually stated prior to William Candler's death in 1936 but the stipulated facts show the date of William's death as October 2, 1935.↩